**Tillman G. FARR, Jr., Plaintiff,**

v.

**James BLODGETT, et al., Defendants.**

**No. CS–91–145–JBH.**

United States District Court,
E.D. Washington.

Jan. 22, 1993.

Tillman G. Farr, Jr., pro se.

Pat L. De Marco, Asst. Washington State Atty. Gen., Olympia, WA, for defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, INTER ALIA**

HOVIS, United States Magistrate Judge.

BEFORE THE COURT is the plaintiff's motion for summary judgment (Ct.Rec. 37) and amendments and addenda thereto (Ct. Recs. 178 and 200). Also before the court

**1488**

is the defendants' motion for summary judgment (Ct.Rec. 44) and addenda thereto (Ct.Recs. 124 and 197). After an acrimonious and protracted discovery battle, it appears this matter is finally ready for resolution on summary judgment.

Plaintiff's 42 U.S.C. § 1983 complaint seeks damages and "reinstatement" of good-time credits as a result of: 1) retaliation for his use of the grievance procedure (First Amendment); 2) arbitrary and capricious placement and retention in segregation resulting from the use of confidential information (Fourteenth Amendment substantive due process and Eighth Amendment cruel and unusual punishment); 3) procedural due process violations accompanying placement and retention in segregation (Fourteenth Amendment).

UNCONTROVERTED MATERIAL FACTS

1. Plaintiff is currently incarcerated at the Washington State Reformatory (WSR) in Monroe, Washington.

2. Plaintiff previously was incarcerated at the Washington State Penitentiary (WSP) in Walla Walla, Washington from approximately June 1989 until November 7, 1990.

3. At all times material to this action, defendant James Blodgett was the Superintendent of WSP.

4. At all times material to this action, defendant John Lambert was an Associate Superintendent at WSP.

5. At all times material to this action, defendant Richard Morgan was a Correctional Captain at WSP.

6. At all times material to this action, defendant Nancy Frazier was the Administrative Segregation Hearing Committee Chairperson and is currently a Correctional Unit Supervisor at WSP.

7. At all times material to this action, defendant Vickie McDaneld was a Correctional Counselor assigned to the Intensive Management Unit (IMU) at WSP.

8. At all times material to this action, defendant Steven Kelsey was a correctional officer assigned to the Industries area at WSP.

9. At all times material to this action, defendant Robert Hults was a correctional sergeant assigned to the Industries area at WSP.

10. Until January 4, 1990, plaintiff was employed as the Material Handler at Metal Plant 1 in the Industries section of the main institution at WSP.

11. Correctional officer Kelsey was assigned to one of the "rover" posts at Industries while plaintiff worked there. Officer Kelsey was one of two correctional officers assigned to maintain the security of the entire Industries area which included two metal shops.

12. As a Material Handler, plaintiff operated a forklift and moved materials throughout the Industries area. In order to maintain the security of the Industries area, a policy existed which required that all inmates remain in the shop to which they were assigned unless they had specific authorization to move to another location and were accompanied by a civilian supervisor.

13. On January 4, 1990, Officer Kelsey issued a general rule infraction to the plaintiff and terminated him from his employment.

14. Following a disciplinary hearing before Lt. Menke on January 9, 1990, the infraction was dismissed. The infraction report reflects that plaintiff contended he was in an authorized area. The infraction was dismissed "per metal supervisors."

15. Plaintiff filed a grievance on or about January 18, 1990 concerning alleged staff misconduct by officer Kelsey. Plaintiff accused officer Kelsey of fabricating lies, violating rules, harassment, threats, etc. The response from grievance coordinator Hal Snively (dated January 18, 1990) was that the grievance was untimely since "he (Kelsey) does not now supervise or effect (sic) you."

16. Plaintiff was reassigned to the metal plant as a welder on or about January 24, 1990.

17. Thereafter, plaintiff directed correspondence to various WSP officials complaining of ongoing harassment from officer Kelsey. Plaintiff directed correspondence to Associate Superintendent Lambert on or about April 16, 1990 and May 1, 1990 and to Superintendent Blodgett on or about May 11, 1990. By letter dated May 11, 1990, Captain Morgan responded to the correspondence addressed to Lambert. Morgan concluded that there was no evidence of harassment. Plaintiff responded to Morgan's letter by correspondence dated May 14, 1990 with a request for a personal meeting with Morgan so that he could present proof of Kelsey's harassment.

18. On May 15, 1990, plaintiff was placed on segregation status. According to the segregation authorization form and an administrative segregation referral form, the reason for placement was that information had been supplied from a confidential source that plaintiff was involved in a plot to assault a correctional officer.

19. On May 15, 1990 plaintiff was provided with a "Notice of Meeting" concerning his placement in segregation. The notice set plaintiff's initial administrative segregation review for May 17, 1990.

20. An initial administrative segregation review was conducted on May 21, 1990 by defendant Nancy Frazier. Frazier recommended continued segregation status on the basis that plaintiff constituted a threat to others. Frazier's recommendation was approved by defendant Blodgett on the same date.

21. Plaintiff received a "Notice of Meeting" form on May 25, 1990 advising him that his first administrative segregation classification hearing was scheduled for May 31, 1990. On the form, plaintiff requested witness statements from the following individuals: James Blodgett, John Lambert, Capt. R. Morgan, Lt. Munden, Sgt. Lee, Correctional Officers Hansen, King, Bennett, Hill, Archuletta, Spencer, Postlewait, Hartwell and Wright, Laundry Supervisors McGranahan and Rhodes, Supervisor Mike Lambert, Instructors Dave Base and Robin Smith, Grievance Coordinator Hal Snively, and Counselor Peggy Jackson. On the form, plaintiff also checked the box requesting that a staff advisor be present at the hearing.

22. On June 4, 1990, Frazier issued a decision recommending that plaintiff be retained in segregation.

23. Plaintiff appealed the decision to Superintendent Blodgett on June 11, 1990. On June 13, 1990, Blodgett approved of Frazier's recommendation but also agreed to personally review the situation alleged to exist by plaintiff.

24. Plaintiff was ultimately transferred to Washington State Reformatory on November 7, 1990 following a series of follow-up segregation hearings and meetings.

## DISCUSSION

### A. Retaliation and Confidential Information In General

Plaintiff alleges that he was harassed by officer Kelsey and ultimately placed in segregation because of the grievance he submitted in January 1990 as well as because of the letters he wrote to top prison officials subsequent to resolution of the grievance.

■■■ "Convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Prisoners retain protections afforded by the First Amendment, including the constitutional right to petition the government for the redress of grievances. *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967). Furthermore, the right to petition applies with equal force to a person's right to seek redress from all branches of government. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972).

 Although plaintiff does not have a fundamental constitutional right to use of a particular grievance procedure, as stated above, he does have a constitutional right to petition the government for redress of grievances. It is well-established that prison officials may not retaliate against an inmate for exercising his constitutional rights. *Jackson v. Cain*, 864 F.2d 1235 (5th Cir.1989); *Cain v. Lane*, 857 F.2d 1139 (7th Cir.1988); *Flittie v. Solem*, 827 F.2d 276 (8th Cir.1987); *Rizzo v. Dawson*, 778 F.2d 527 (9th Cir.1985). Consequently, any actions taken against plaintiff, motivated by retaliation for plaintiff's exercise of his constitutional right to petition the government for redress of grievances, constitute a violation of plaintiff's constitutional rights.

Plaintiff's retaliation claim is connected in great part to his substantive due process and Eighth Amendment claims. Plaintiff alleges that officer Kelsey and perhaps other of the named defendants have fabricated the purported confidential information used to justify his segregation and his removal from prison employment. Plaintiff suggests that some of the defendants have covered-up the retaliation and the use of false information.

Quite a number of cases have discussed the use of confidential information, primarily in disciplinary segregation proceedings. In *Wolff v. McDonnell*, 418 U.S. 539, 567–69, 94 S.Ct. 2963, 2980–81, 41 L.Ed.2d 935 (1974), the Supreme Court held that at "the present time," the Constitution did not confer a right of cross-examination in prison disciplinary cases. According to the Court:

> If he [the inmate] proposes to examine an unknown fellow inmate, the danger may be the greatest since the disclosure of the identity of the accuser, and the cross-examination which will follow, may pose a high risk of reprisal within the institution. Conversely, the inmate accuser, who might freely tell his story privately to prison officials, may refuse to testify or admit any knowledge of the situation in question.

*Id.* at 568, 94 S.Ct. at 2981.

It is well-settled in the Ninth Circuit that due process does not require disclosure of the identity of any person providing information leading to the placement of a prisoner in administrative segregation. *Toussaint v. McCarthy*, 801 F.2d 1080, 1101 (9th Cir.1986). Nevertheless, the use of confidential information in segregation proceedings is still subject to a determination as to its reliability. *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir.1987).

In *Cato*, a confidential informant told a correctional captain that there was plan among some inmates to take hostages in order to effectuate an escape from San Quentin state prison. The informant had been told this information by another inmate, Johnson, who asked him to make some knives out of metal stock to be provided by Cato who worked in the industries area. However, Johnson did not specifically tell the informant that Cato was involved in the plot. Johnson only stated that Cato was the source of the metal stock. Based on that information, Cato was immediately placed into administrative segregation. Cato subsequently was infracted and found guilty of disciplinary charges. *Id.* at 704.

The court found that there was not "some evidence" sufficient to support the finding of guilt. The only evidence was the *uncorroborated hearsay statement* of a confidential informant. The informant only knew what had been told him by inmate Johnson. Furthermore, the reliability of Johnson's statements were not enhanced by the results of his polygraph examination and Johnson never stated that Cato knew of the plot, only that Cato was the source of the metal stock. *Id.* at 705.

*Mendoza v. Miller*, 779 F.2d 1287 (7th Cir.1985) noted that courts must balance the interest of the government in institutional safety and an efficient disciplinary system with the interest of the inmate in receiving a fair hearing. To protect the inmate's interest in a fair hearing, there must be some indication that the confidential information is reliable. According to the court, the reliability of a confidential informant may be established by: 1) the oath of the investigating officer as to the truth of his report containing confidential information and his appearance before the

disciplinary committee; 2) corroborating testimony; 3) a statement on the record by the chairman of the disciplinary committee that he had firsthand knowledge of the sources of the information and considered them reliable on the basis of their past record of reliability; *or* 4) *in camera* review of material documenting the investigator's assessment of the credibility of the confidential informant. *Id.* at 1293 (citations omitted).

■ *In camera* review determines: (1) whether providing the inmate with more specific factual information would seriously risk exposing the identity of the confidential informant; (2) whether the confidential report contains sufficient additional information to bolster the reliability of the confidential information; or (3) whether the disciplinary committee adopted the credibility determination made by the prison investigator. *Id.* (citations omitted).

Submission of a confidential report for *in camera* review allows the court to determine whether a hearing officer's actions were fair—i.e. whether the officer acted in an arbitrary and capricious manner by accepting confidential information without some indication as to the reliability of the information. Prison officials do not have to state specifically on a public record the factual basis for their findings as to the reliability of the confidential informant. *Id.* at 1295.

■ In compliance with this court's order (Ct.Rec. 110) defendants have submitted to the court, for *in camera* review, the confidential information used to place and retain plaintiff in segregation. This court's review is *deferential* because it is inherently dangerous to even attempt to determine the reliability of an informant since such effort could jeopardize lives and the willingness of informants to continue providing information. Prison officials are given broad discretion when balancing the inmate's due process interests in institutional safety and an efficient disciplinary system. *Id.* (citations omitted).

**B. Liberty Interests and Procedural Protections**

The court is quite cognizant of the fact that *Wolff, Cato* and *Mendoza* involve *disciplinary* proceedings as opposed to *administrative segregation* proceedings. Whereas the former involves the use of more restrictive confinement as a *punitive* measure, the latter involves removal of the prisoner from the general population for ostensibly *non-punitive, non-disciplinary reasons.* Washington Administrative Code (WAC) 137–32–002(8). WAC 137–32–005 provides that an inmate may be administratively segregated if his presence in the general inmate population would constitute a serious threat: (1) to the safety of institution staff, visitors or other inmates; (2) to such inmate's safety; (3) of an escape by such inmate; or (4) to the orderly operation of the institution.

The Supreme Court has enumerated the rights which inmates of state prisons are entitled to in disciplinary proceedings as a matter of procedural due process under the Fourteenth Amendment. Where the prisoner is charged with serious misconduct and is penalized with the loss of "good-time" credits (reductions of prison term for good behavior) or with punitive segregation, the prisoner's rights have been stated to include (1) advance written notice of the charges against him or her, (2) an opportunity to call witnesses and present documentary evidence, provided that to do so will not jeopardize institutional safety or correctional goals, and (3) a written statement by the factfinder of the evidence relied upon and reasons for the disciplinary action taken. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

■ As noted, however, the due process clause does not entitle the prisoner to confrontation or cross-examination procedures nor to counsel, and the disciplinary board is not required to make its determinations based solely upon the evidence presented at the hearing. *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). The Supreme Court has also held that prison officials are not required to provide reasons in writing to inmates

who are denied the privilege of cross-examining or confronting witnesses against them, nor is there a requirement that the hearing record specify the reasons for a refusal to call witnesses requested by an inmate, although the officials must state their reasons for failing to call requested witnesses when this decision is properly subject to a due process challenge in court.[1] Moreover, the Supreme Court has ruled that a decision by officials to revoke a prisoner's good-time credits will be upheld as long as "some evidence" of the prisoner's misconduct is reflected in the record. *Superintendent v. Hill*, 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985).

■ Administrative segregation is subject to a different constitutional analysis. Remaining in the general prison population is not a liberty interest independently protected by the Due Process Clause. *Hewitt v. Helms*, 459 U.S. 460, 468–69, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983). However, states may create a protected liberty interest by the use of "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed, ... and that administrative segregation will not occur absent specified substantive predicates...." *Id.* at 471–72, 103 S.Ct. at 871.

■ A constitutionally protected liberty interest may be created by statutes or regulations that impose substantive limitations on the exercise of official discretion. *Id.* at 470–71, 103 S.Ct. at 871. To establish a protected interest, a prisoner must show that particularized standards or criteria guide the decision maker. *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). "If the decision maker is not 'required to base its decisions on objective and defined criteria,' but 'can deny the requested relief for any

constitutionally permissible reason or for no reason at all,' *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 467 [101 S.Ct. 2460, 2465–66, 69 L.Ed.2d 158] (1981) (Brennan, J., concurring), the State has not created a constitutionally protected liberty interest." *Olim*, 461 U.S. at 249, 103 S.Ct. at 1747.

■ Currently, there is no published decision from this district, nor is there a published Ninth Circuit decision, determining that Washington's (administrative segregation) regulatory scheme creates a liberty interest in inmates remaining in the general prison population. Defendants cite the recent decision of Chief Judge Quackenbush in *Smith v. Blodgett*, 798 F.Supp. 637 (E.D.Wa.1992) apparently for the proposition that there is no such liberty interest. However, the effect of that decision must be limited specifically to inmate Smith. Chief Judge Quackenbush relied on an *unpublished* decision from the Ninth Circuit involving the same inmate Smith (*Smith v. Kropf*, 972 F.2d 1342 (9th Cir.1992)). The circuit decision concluded that Washington had not created a liberty interest. Normally, unpublished decisions are of no precedential value (Ninth Circuit Rule 36–3), and may not be cited. However, Chief Judge Quackenbush relied on the decision because of collateral estoppel. In that circumstance, the Ninth Circuit allows its unpublished decisions to be cited. According to Chief Judge Quackenbush:

> The Ninth Circuit has previously found that *the Plaintiff Scott C. Smith* does not have a liberty interest in remaining in the general prison population, and that without such a liberty interest, *Smith's* right to due process has not been violated.

(Emphasis supplied).

■ As a general rule, collateral estoppel precludes relitigation in a second

---

1. *See Ponte v. Real*, 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). Although due process requires prison officials at some point to explain their reasons for refusing to call witnesses, they may do so either by making the explanation part of the administrative record in the proceeding or by later presenting testimony in court if the refusal to call the requested witnesses is challenged as a deprivation of a liberty

interest under the due process clause. The court acknowledged "it would be useful" for the disciplinary board to state its reasons for refusing to call a witness. However, the court said that nowhere in *Wolff* or in *Baxter* did it make this suggestion a constitutional requirement and that eleven years of experience since *Wolff* did not indicate any need to do so.

(and different) cause of action of issues actually litigated and necessary to the outcome of the first cause of action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). There are two types of collateral estoppel—offensive and defensive. Defensive use involves a scenario where the party against whom estoppel is asserted has litigated and lost in an earlier action. It precludes a plaintiff from relitigating identical issues by merely switching adversaries. *Id.* at 329, 99 S.Ct. at 650.

Inmate Farr, unlike inmate Smith, has not had an opportunity to fully and fairly litigate the liberty interest question. Accordingly, inmate Farr is not collaterally estopped because of the rulings in the *Smith* cases.

■■■ The undersigned has consistently found that the state of Washington has created a liberty interest by virtue of its administrative segregation regulatory scheme.[2] WAC 137–32–005 [3], when read in conjunction with WAC 137–32–001 [4] creates a liberty interest. WAC 137–32–001 states that its purpose is to define the reasons for segregating inmates and 137–32–005 lists the reasons the superintendent *must verify* in order to justify administrative segregation. Although WAC 137–32–005 does not expressly state that action can be taken *only* if the stated reasons are present, such a restriction is implied by WAC 137–32–001.

The conditions listed in 137–32–005 are "substantive predicates" to the placement of inmates in administrative segregation. All of these substantive predicates are couched in general terms such that there is some inherent discretion in determining whether certain factual circumstances are serious enough to warrant placement of an inmate in administrative segregation. For example, prison officials have to decide exactly what constitutes a "threat to the orderly operation of the institution." This is not a neatly defined standard. Nevertheless, this does not detract from the character of these factors as "substantive predicates."

In *Hewitt*, one of the relevant regulations provided that an inmate *"may* be placed in Close or Maximum Administrative Custody upon approval of the officer in charge of the institution, *not routinely but based on his assessment of the situation and the need for control pending application of procedures under ... this title."* Another regulation provided that an inmate could be placed in administrative custody on the basis that he constitutes a *"threat of a serious disturbance."* 459 U.S. at 470 n. 6, 103 S.Ct. at 871 n. 6. Arguably, these substantive predicates are as broad as the WAC's "orderly operation" provision. Nevertheless, the Supreme Court held that these substantive predicates in connection with mandatory language requiring that certain procedures "shall," "will," or "must" be employed were sufficient to create a liberty interest.

The WAC regulations require that certain procedures be used when an inmate is placed in administrative segregation. Initial review meetings, classification meetings, and intermediate informal review hearings are mandatory. WAC 137–32–010, 137–32–015, 137–32–020. These provi-

---

**2.** The undersigned has also found that the state has created a liberty interest in other settings, namely feces watch and visitation. *See Mendoza v. Blodgett*, 960 F.2d 1425 (9th Cir.1992) *cert. denied* — U.S. ——, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993).

**3.** WAC 137–32–005 Initial Placement. (1) The superintendent *may* segregate an inmate from the general inmate population and assign such inmate to a segregation or intensive management unit *if, in the judgment of the superintendent,* the presence of such inmate in the general population would constitute a serious threat: (a) to the safety of institution staff, visitors or other inmates; (b) to such inmate's safety; (c)

of an escape by such inmate; (d) to the orderly operation of the institution. (2) The superintendent *must* verify the reason for placing the inmate in a segregation or intensive management unit and document the fact supporting such reason.

**4.** WAC 137–32–001 Purpose. The rules in this chapter define the *reasons* and establish the process for classifying inmates of adult correctional institutions to administrative segregation status, assigning such inmates to a segregation or intensive management facility or unit and continuing such classification status.

sions contain mandatory language requiring that certain procedures "shall" and "will" be conducted in connection with each type of meeting or hearing.

The one distinguishing feature of the Pennsylvania regulation at issue in *Hewitt*, is language directing that if no behavior violation has occurred, the inmate *must* be released as soon as the security concern has abated, but in all cases within ten days. It was language similar to this which led the Ninth Circuit in *Toussaint v. McCarthy*, 801 F.2d 1080 (9th Cir.1986), to find that California prison regulations created a liberty interest. Section 3339(a) provided that "release from segregation status *shall* occur at the earliest possible time in keeping with the circumstances and reasons for the inmate's initial placement in administrative segregation." According to the court, this provision incorporated the substantive predicates outlined in section 3335 (immediate threat to the inmate's own safety, the safety of others; endangers institution security; or jeopardizes the integrity of an investigation into serious misconduct or criminal activities), such that absent the appropriate justification, an inmate could not be retained in segregation. *Id.* at 1097–98.

The WAC does not contain a "release" provision similar to that found in *Hewitt* and *Toussaint*. However, the practical effect of the WAC regulations, taken as a whole, is that there must be specific justification for continued retention in administrative segregation based on one or more of the reasons set forth in 137–32–005. The substantive predicates set forth in WAC 137–32–005 cannot be read in isolation. Not only must one of those substantive predicates exist to justify initial placement by the superintendent, the substantive predicate must exist in order to justify continued placement. Washington corrections officials cannot use any reason or no reason at all to justify segregation.

WAC 137–32–010 states that immediately after initial placement there shall be an initial review hearing. Following the hearing, the hearing officer is to prepare a written report which includes the informa-

tion provided to the inmate, *the reason for initial placement in a segregation or intensive management unit*, the inmate's response to the allegation resulting in the initial placement and the hearing officer's recommendation whether to continue the segregation or release the inmate. Based on this report, the superintendent either accepts or rejects the recommendation.

WAC 137–32–015 states that a classification meeting will be held within ten working days after the initial review meeting decision. Not less than 48 hours prior to each classification meeting, the hearing officer or his designee is required to inform the inmate *of the specific allegations supporting placement or retention in administrative segregation.* Following the classification meeting, the hearing officer recommends whether the inmate should be retained in segregation, released to general population, or transferred to another facility, in or out of state. The superintendent then takes action based on this recommendation.

WAC 137–32–020 provides for an intermediate informal review twenty working days after the superintendent's decision to retain an inmate on segregation status following the first classification meeting. After this review, the hearing officer prepares a written summary along with recommendations which are forwarded to the superintendent who can either release the inmate or retain him in segregation.

WAC 137–32–025 provides that an inmate may be placed on intensive management status if the hearing officer makes such a recommendation providing the *reasons* therefor. The superintendent reviews the recommendation and if he approves it, forwards a copy to the director for final approval. Inmates not approved for intensive management status are retained on segregation status pending implementation of the action ordered by the director in lieu of assignment to intensive management.

WAC 137–32–025 provides that the superintendent *may* release an inmate from segregation status at any time after determining, in his judgment, *the conditions or reasons which required the inmate's seg-*

*regation no longer exist.* However, only the director has the authority to release an inmate from intensive management status.[5]

The WAC provisions relating to classification meetings, intermediate informal review, and IMU placement do not expressly refer to the substantive predicates contained in WAC 137–32–005. On the other hand, there is nothing in these provisions which states that the superintendent or the director can rely on any other reason not enumerated in WAC 137–32–005 to justify segregation. The regulations do not allow the superintendent or director to make up other or additional reasons as the hearing process develops. They must work within the framework of the enumerated substantive predicates in WAC 137–32–005. Initial placement starts the whole process. The superintendent must verify the reason for initial placement among the four possible choices. If the cited reason is not proved at one of the hearings, the WAC regulations require release from segregation. The superintendent's decision whether to retain the inmate in segregation following the initial review hearing and the first classification meeting does not exist in isolation from the provision requiring the superintendent to verify the substantive predicate for initial placement.

The director's authority to place inmates in IMU also does not exist in a vacuum. Extended IMU placement does not become an issue until initial placement has been verified by the superintendent and an initial review hearing and a classification meeting has taken place. Furthermore, the director relies on the superintendent's recommendation in determining whether an inmate should be placed in IMU.

The fact that the superintendent and the director have the unfettered discretion to release the inmate at any time from segregation is irrelevant. In order to create a liberty interest, it is not necessary for the administrator to be forced to deprive the inmate of the interest whenever the substantive predicates are met. Rather, it is only necessary for the administrator to be forced not to deprive the inmate of the interest, unless the substantive predicates are met. *Layton v. Beyer,* 953 F.2d 839, 847 (3rd Cir.1992).

*Layton* is one of the more recent circuit cases to find that inmates have a liberty interest in remaining free from administrative segregation. It involves New Jersey regulations. The court found that the regulations contained explicit substantive predicates which had to be met before inmates could be placed in the Management Control Unit or the Prehearing Management Control Unit. *Id.* The predicates included that "the inmate must present a threat to the safety of others, a threat to property, or a threat to the operation of the facility." *Id.* at 843. According to the court, absent these substantive predicates, the administrative officials had no discretion to place an inmate in MCU or prehearing MCU. *Id.* at 847. An inmate who does not meet any of these criteria has a reasonable expectation that he will not be placed in segregation.[6] Furthermore, the *Layton* court held that the substantive predicates were part of an exclusive list which limited official discretion. Prison officials could not use criteria outside of the list in order to justify segregation. *Id.* at 843. The court also noted that although an inmate could be removed from the general population and be placed in segregation for a short period of time without a hearing, this did not diminish the liberty interest. *Id.* at 847–48. *Hewitt* only requires a post-placement hearing within a reasonable time after the prisoner is confined in segregation. 459 U.S. at 477, 103 S.Ct. at 874.

With respect to what process is due before an inmate can be administratively segregated the Court held,

---

**5.** Clearly, segregation can include a stint in IMU or some lesser form of restrictive confinement which does not take place in IMU, but which nevertheless involves removal from the general population.

**6.** The New Jersey regulation does not contain the express "release" language found dispositive in *Hewitt* and *Toussaint.* According to the *Layton* court, the New Jersey regulations imply that release is mandated when the substantive predicate no longer exists. *Layton,* 953 F.2d at 846 n. 13.

We think an informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Id.* at 476, 103 S.Ct. at 874.

C. Reliability of Confidential Information

█ Obviously, the procedural requirements applicable in the segregation context are much less stringent than the requirements applicable to disciplinary proceedings. Plaintiff was segregated for administrative reasons. As far as this court can discern, he was never charged with any type of disciplinary infraction.[7] Plaintiff argues that the absence of an infraction or a criminal investigation, despite the seriousness of the allegations against him, suggests that the confidential information is bogus.

Conceivably, an indirect threat to a correctional officer via a conspiracy to assault might qualify as some type of general or serious infraction.[8] Staff members are not required to write up an infraction report for general infractions. Instead, they can make an "on-site adjustment." *See* WAC 137–28–040 and 045. In the event of a serious infraction, the staff member must prepare and submit an infraction report. WAC 137–28–045. The superintendent has a duty to report any violation of federal, state or local law to law enforcement agencies. WAC 137–28–035. However, that same provision states:

> *The provisions in this rule shall not preclude the reasonable segregation of the inmate in accordance with administrative segregation rules appearing in this chapter.*

This court is not entirely sure whether the alleged conspiracy to assault Officer Kelsey would necessarily be considered a prosecutable offense under the Revised Code of Washington. RCW 9A.28.040 states that a person is guilty of a criminal conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement. In Washington, it has been held that conduct is not a "substantial step" unless it is strongly corroborative of the actor's criminal purpose. Mere preparation to commit a crime will not support an attempt conviction. *State v. Jackson*, 62 Wash.App. 53, 813 P.2d 156 (1991). It is not for this court to determine whether there was a "substantial step" involved in this alleged conspiracy.

Based on the record before it (which includes the *in camera* confidential information), the court does not find it particularly significant that Captain Morgan did not issue a serious infraction report to the plaintiff or that Superintendent Blodgett did not report the matter to state or local law enforcement agencies. In their discretion, they believed that the most appropriate course of action was administrative segregation.[9]

7. According to the segregation referral and segregation authorization forms, plaintiff was placed in segregation pursuant to WAC 137–32–005 as being a threat to others, a threat to security and a threat to the orderliness of the facility. (Exs. 12 and 13 to Ct.Rec. 47).

8. A direct threat to a correctional officer would probably qualify as a serious infraction under 137–28–030(506)—"Threatening another with bodily harm or with any offense against his/her person."

9. The court will not pretend that administrative segregation does not have certain adverse conse-

The next question is whether confidential information should be treated any differently in an administrative segregation proceeding versus a disciplinary proceeding. More specifically, the question is whether the reliability of confidential information for an administrative segregation can be any less than the reliability necessary to support a finding of guilt on a disciplinary infraction. Notwithstanding the obvious difference in procedural requirements for each process, this court believes that in the administrative segregation context, there are still compelling reasons why confidential information should meet certain standards for reliability. Administrative segregation and disciplinary segregation share much in common in terms of the type of restrictive physical confinement to which the inmate may be subjected. *Compare* WAC 137–32–025 and 030 with WAC 137–28–105. Of course, a finding of guilt on a disciplinary infraction may also result in a loss of good-time credit.[10]

Although the Supreme Court has imposed a "some evidence" requirement on prison officials to justify a finding of guilt on a disciplinary infraction, it has not done so (at least explicitly) in the administrative segregation context. Nevertheless, because a liberty interest is at stake, it seems that the law would no more countenance an irrational, arbitrary and capricious administrative segregation than it would an irrational, arbitrary and capricious finding of guilt on a disciplinary infraction. Accordingly, despite the less stringent *procedural* requirements for an administrative segregation, this court believes that the *substantive* realities require that confidential information be no less reliable in the administrative segregation context.

On May 15, 1990, Correctional Officer Harold E. Postlewait[11], the Laundry Officer, prepared an interdepartmental memorandum which stated that on the above date and at a specified hour, he was contacted by an inmate who informed him that he had overheard the "listed" inmates threatening to "get" Officer Kelsey. Among those listed is the plaintiff. The memorandum was addressed to Captain Morgan. Based on this information, Morgan prepared an "Informant Testimony Addendum" form identifying the informant by name and institutional number and indicating that the informant witness was both credible and reliable and that he would be subject to a risk of harm if his identity were disclosed. The report also indicated that the informant had verbally communicated with Postlewait.

A May 22, 1990 memorandum from Sgt. Hults to Captain Morgan details plaintiff's prior history with Officer Kelsey (the January 1990 incident and the resulting infraction). It also indicates that after Postlewait relayed the information to Hults, the informant was shown a photo montage of inmates working "in the area." From this montage, the informant identified the plaintiff and two other inmates. Eventually, the informant identified a fourth inmate as being involved in the alleged conspiracy.

In a May 30, 1990 memorandum from Captain Morgan to the Major Hearing Committee, he indicated that the "information and informant was scrutinized and determined to be reliable and accurate." The

quences for the inmate. However, on the whole, those consequences are much less severe than the potential consequences resulting from a disciplinary infraction or a charged criminal offense.

10. In the instant case, plaintiff alleges he lost his chance to *earn* additional good-time credit because his segregation resulted in the loss of his prison employment. Plaintiff's prison employment enabled him to earn such credit. However, being deprived of the capacity to *earn* credit is not the same nor as severe as actually losing credit already accrued. In addition, as a general proposition, prisoners do not have a

constitutional right to prison employment. *Ingram v. Papalia,* 804 F.2d 595 (10th Cir.1986).

11. Initially, there was some hesitancy on the part of defendants to disclose the name of the reporting officer for fear that this in turn might lead to disclosure of the identity of the informant. After a show cause hearing, this court ordered that the identity of the correctional officer be disclosed (Ct.Rec. 189). The court did not make that determination without serious deliberation. The court recognizes the inherent dangers involved in the area of inmate confidential information.

memo noted that prior to the informant coming forward with the information, staff had reported tensions were high "in the area" and that there were rumors of an impending lockdown. The memo indicates that following segregation of plaintiff and the others, reports from the Tower Nine Gate area indicated tensions had eased and inmates had told staff the correct individuals had been apprehended.

The above represents the information received and reviewed *contemporaneously* with the plaintiff's initial placement in segregation. In the various affidavits submitted in support of their summary judgment motion, defendants have commented further upon the confidential informant and the confidential information.

Sgt. Hults states that:

I was familiar with the inmate who provided the information as he had provided prison staff with confidential information in the past which was reliable. Additionally, another inmate confirmed the information provided by the first inmate, and this second inmate had also previously provided reliable information to prison staff.

(Ct.Rec. 127).

In his affidavit (Ex. 11 to Ct.Rec. 47), Captain Morgan states that on May 15, 1990, Hults approached him with information that a correctional officer in his command had received confidential information from an inmate. Morgan says Hults told him the informant was a "mature inmate who usually kept to himself and had provided general information in the past which was shown to be reliable." Morgan states he had no direct contact with the informant.

Morgan adds that he interviewed the correctional officer (Postlewait) to whom the information was communicated.[12] According to Morgan, "the officer indicated to me that the confidential informant had nothing to gain by revealing the information, was not in competition with Tillman Farr in any way, and had provided general information in the past which was reliable." Morgan

states that he directed plaintiff to be placed in segregation and that thereafter, the "confidential informant further revealed that Mr. Farr was indeed the inmate leading a plot to assault Correctional Officer Kelsey and that tensions had improved since Mr. Farr's placement in segregation."

According to defendant Nancy Frazier (Ex. 16 to Ct.Rec. 47), prior to the initial segregation review, she read the confidential information. She also spoke with Hults, Morgan and Kelsey. Frazier states she "had no reason to doubt that confidential informant had provided credible and reliable information." Prior to the first segregation hearing, Frazier says she spoke to plaintiff's counselor, Peggy Jackson, Hults, Morgan, Kelsey and an unidentified Intelligence and Investigation Officer. According to her, "these conversations did not reveal any information to dissuade [my] belief in the confidential information." Frazier states she spoke with the same individuals prior the intermediate informal hearing, however, she received no additional information questioning the veracity of the confidential informant.

According to defendant Blodgett (Ex. 10 to Ct.Rec. 47), he was informed by Captain Morgan that confidential information had been received concerning the plaintiff. Blodgett says he did not ask and was not told the identity of the confidential informant although he "would normally follow up on such confidential information by verifying the reliability of the source with Captain Morgan."

Vicki McDaneld, a classification counselor, indicates no more than that she reviewed the confidential information in the file following plaintiff's placement in segregation. Based partly on that information, she recommended that plaintiff remain in segregation. (Ex. 22 to Ct.Rec. 47).

Steven Kelsey states that he first heard of a plot to assault him from Sgt. Hults. He states that he did not provide any information to Hults about a possible plot because he had no knowledge of a plot prior to being approached by Hults. He states that he did not provide any information to

---

12. He states that Kelsey was not the correctional officer approached by the informant.

Morgan, Lambert or Blodgett about a possible plot. He also states that he had no knowledge of any grievance or complaint filed against him by the plaintiff until the plaintiff was no longer working in the metal shop. (Ex. 4 to Ct.Rec. 47).

█ Plaintiff has suggested that the confidential source was actually a correctional officer and not an inmate. There is simply no evidence to support that allegation. The inmate is identified by name and institutional number in the confidential information submitted *in camera* to this court.[13] Officer Postlewait's signature appears on the document on which that information is contained. Hults has sworn that this inmate provided the information. Hults' affidavit indicates he was present when the inmate reviewed the photo montage. Morgan has never questioned the identity of the inmate as the source of the information. Blodgett states that correctional officers cannot be confidential sources since they are required to sign their name to any document which reports inmate misconduct.

Plaintiff questions whether Officer Postlewait could have received the confidential information. Plaintiff states that the laundry is "separate and totally isolated" from the rest of the Industries area for security reasons. Further, the plaintiff adds:

> The only persons able to come and go to and from the laundry are inmates going to or coming back from call outs, other supervisors and correctional officers. The inmates who work in the laundry eat separately and at different times from the rest of the workers in industries. The scenario of a conspiracy being overheard is quite impossible. Since Officer Postlewait is a laundry supervisor, the question might arise as to HOW HE WAS APPROACHED BY THE ALLEGED CONFIDENTIAL INFORMANT, when he, is in no way connected or involved in plaintiff's work area and

did not have access to any other areas in Institutional Industries.

(Ct.Rec. 200).

Plaintiff notes that three other inmates were implicated in the alleged conspiracy: Clyde Patterson, Lamar Franklin and Felix Perez. According to plaintiff, Patterson and Perez were segregated on the same day as plaintiff; however, inmate Franklin was not placed in segregation for an additional two days. Plaintiff states that after ninety days, only plaintiff remained in IMU. He adds:

> Plaintiff and the other three inmates never worked together, ate together, socialized nor lived in the same units, with the exception of inmate Franklin, who lived in the same unit, approximately 10 cells away from plaintiff.

It is possible that an inmate, for whatever reason, might fabricate information about another inmate. It is possible that a correctional officer might fabricate information about a particular inmate. There is no presumption that all correctional officers are models of good conduct and professionalism at all times. The court recognizes that harmony does not necessarily abound in a correctional institution. It is for these reasons that supervisory prison officials and the courts must be especially careful in assessing the reliability of confidential information.

Plaintiff's allegations do not persuade the court that the information could not have been reliable. Plaintiff does not claim that on May 15, 1990 he did not know the other inmates implicated in the alleged plot. He admits that Franklin lived in the same unit. The fact that inmate Franklin was not segregated as quickly as the other inmates may have something to do with the fact, as alleged by defendant Hults, that Franklin was not identified as quickly as the other inmates (Ct.Rec. 127).

The fact that Patterson, Perez and Franklin may have been released from IMU earlier than the plaintiff does not necessarily appear suspicious. The court will

---

**13.** This is considered evidence of reliability. See *Wells v. Israel*, 854 F.2d 995, 1000 (7th Cir.1988).

not speculate about the reasons for such action. The defendants have not discussed the situations of these other inmates and the record does not contain any affidavits from these other inmates. The court would note, however, that if plaintiff's statement is accurate, these other inmates spent three months in IMU for the alleged plot. Three months is a relatively substantial amount of time.

Plaintiff's allegations do not convince the court that it was truly impossible for Officer Postlewait to have received the confidential information. It is not clear whether the informant was employed in the laundry room. It is not clear where Officer Postlewait might have been approached by the informant. The penitentiary is a large place. It is conceivable that the meeting could have taken place in a number of different locations.

Finally, the court notes plaintiff's statement that on May 15, 1990 following completion of the work day, he met a friend at "9 tower gate" where, "because of the long line, plaintiff and his friend decided to sit on the back dock of the laundry and wait for the line to go down." Plaintiff does not identify his friend. The fact they were sitting on the back dock of the laundry having a discussion does not mean they were plotting an assault. However, plaintiff's statement suggests there may have been occasions when he was in the general vicinity of the laundry room.

The court is not inferring that there was actually a plot to assault Officer Kelsey. It is not the court's responsibility to determine whether there was such a plot. The court's responsibility is to determine whether prison officials arbitrarily and capriciously segregated the plaintiff based on unreliable confidential information that there was such a plot. Plaintiff's allegations do not persuade the court that defendants acted arbitrarily and capriciously.

It is true that Officer Postlewait's memorandum does not specify the location at which the information was relayed to him. Officer Postlewait's memorandum does not make any assessment of the informant's credibility or reliability, however Morgan states that Postlewait told him the informant was both credible and reliable. The memorandum prepared by Sgt. Hults contemporaneous with the disclosure of the information does not assess the informant's credibility or reliability, although it is apparent that at that time, Sgt. Hults had direct contact with the informant. Captain Morgan states that on or about May 15, 1990, Hults offered him an assessment of the informant's credibility and reliability. In his affidavit (submitted with defendants' supplemental summary judgment motion), Hults states that another inmate, considered reliable and credible, subsequently corroborated the testimony of the informant. However, the *in camera* file does not contain any information about this second inmate and Morgan never mentions such an inmate in his affidavit or written reports.

Captain Morgan did not have direct contact with the informant. He relied on verbal and written reports from Postlewait and Hults and presumably had access to the informant's prison file. Based on that information, he concluded that the informant was credible and reliable. Although both Hults and Postlewait informed Morgan that the informant had provided reliable information in the past, the *in camera* file does not provide any specifics about this past information or the informant's relationship, if any, with the plaintiff.

Defendant Frazier apparently did not have direct contact with the informant. However, she was privy to the materials available to Captain Morgan—Postlewait's memorandum, Hults' memorandum and Morgan's report. Defendant Frazier also spoke with Hults and Morgan, although it is not clear whether she spoke with Officer Postlewait. Neither defendant Blodgett or defendant McDaneld had any direct contact with the confidential informant and the court questions whether they had any obligation to independently verify Captain Morgan's conclusions.

Clearly, the facts of the instant case do not approach the situation in *Cato* where prison officials relied on what one inmate had been told by another inmate—an uncor-

roborated hearsay statement. The informant, in the instant case, alleged that he overheard an actual conversation between the plaintiff and the other inmates. It is not clear whether he actually saw the inmates or whether he subsequently identified them by associating voices with faces. There apparently were no other inmates or staff to corroborate what the informant says he overheard. It certainly would be possible that only the informant was in the vicinity of the conversation.

The fact that Morgan and Frazier did not have direct contact with the confidential informant is not of great significance. Subjecting the informant to a continual battery of interviews by top prison officials might very well increase the chances of making the informant's identity known to the general prison population. *See McCollum v. Miller*, 695 F.2d 1044, 1049 (7th Cir.1982). The absence of details concerning the informant's past activities, although perhaps relevant and useful for determining his reliability, is not fatal. In *Mendoza,* the court found that the investigating officer provided a sufficient warrant of reliability by stating in his affidavit: 1) that the confidential informants have provided reliable information in the past; 2) that he had given material to the disciplinary committee chairman identifying the informants in supporting his findings of reliability; and 3) that his confidential report submitted both to the committee and to the court incorporated his material documenting the informant's reliability. 779 F.2d at 1296. Morgan's affidavit and his written reports establish that the confidential informant had provided reliable information in the past and that hearing officer Frazier was given access to the confidential materials which identified the informant. Furthermore, Morgan's confidential report, submitted to the hearing officer and to this court, incorporate his materials documenting the informant's reliability.

Plaintiff suggests that Hults and Postlewait were supporting Kelsey's purported agenda to have plaintiff permanently removed from the Industries area. Hults worked with Kelsey in Industries and plaintiff states that he complained to Hults about Kelsey on several occasions. However, there is no evidence that Hults displayed any animosity towards plaintiff or that Hults had an unusually close relationship with Kelsey. Hults' affidavit indicates that Kelsey informed him on January 4, 1990 that he found the plaintiff outside of the authorized area. Hults apparently concurred with Kelsey's charge based on the statement of Otto Krause, the plaintiff's immediate supervisor. According to Hults, Krause told a different story at the disciplinary hearing which resulted in the dismissal of the infraction.

There is no evidence that Postlewait had any prior involvement with Kelsey or with Hults, for that matter. The fact that Postlewait relayed the information to Hults would not be unusual since plaintiff was working in the Industries area at that time and Hults was a person with authority in that area.[14]

The court fails to see any basis on which Morgan should have doubted Hults or Postlewait. He personally interviewed both men regarding the contents of their memoranda submitted in May 1990. Defendant Frazier undertook an independent investigation. She also interviewed Hults, as well as Morgan, Kelsey and the plaintiff's counselor, Peggy Jackson. The fact that she may not have interviewed Postlewait is not significant, since Hults also had direct contact with the informant.

The court concludes, as a matter of law, that defendants Morgan and Frazier reasonably relied on the confidential information to justify plaintiff's placement and retention in segregation.

**14.** The court notes that plaintiff requested a witness statement from Postlewait prior to the first administrative segregation classification hearing. It is not clear whether at this time, plaintiff already suspected that Postlewait was the reporting officer or if the plaintiff wanted

Postlewait to testify for a different reason. Postlewait's response was that confidential information had been handed over to the captain's office and that Captain Morgan should be contacted.

There is no evidence that Hults fabricated the confidential information or was in any way involved with alleged retaliatory acts by officer Kelsey.

Plaintiff has offered no direct evidence that the information was fabricated by Kelsey, and the circumstantial evidence he has offered simply is not sufficient to raise a genuine issue of material fact. There is no evidence connecting Kelsey to Officer Postlewait or to the confidential informant.

Kelsey's affidavit states that he did not know of the January grievance or any other complaint until plaintiff was no longer working at the metal shop. Plaintiff has not offered any evidence to the contrary.[15] Therefore, even if there was some antagonism between Kelsey and the plaintiff (whether of Kelsey's doing or the plaintiff's doing or a mutual effort), the court must rule as a matter of law that this antagonism[16] was not motivated by plaintiff's exercise of his constitutional rights.

### D. Jurisdiction Re Blodgett, Lambert and McDaneld

▮ Plaintiff apparently seeks to hold Blodgett liable for rejecting plaintiff's appeal of Frazier's hearing decision. Blodgett agreed with the recommendation to retain plaintiff in segregation, however, he also indicated that he would personally review the situation. Plaintiff apparently takes issue whether Blodgett did in fact personally review the situation. Blodgett did not issue a written report concerning his review, however his affidavit states that he found no problems with Officer Kelsey's behavior. The court fails to see how Blodgett had any legal obligation to undertake an independent review of the confidential information or to undertake any other action with regard to plaintiff's complaints about officer Kelsey.

▮ Under section 1983, a person deprives another of a constitutional right " 'if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains].' " *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir.1988) *quoting Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978) (emphasis original). Plaintiff cannot hold a defendant liable solely on the basis of his supervisory position because the Civil Rights Act does not permit liability under respondeat superior. *Padway v. Palches,* 665 F.2d 965, 968 (9th Cir.1982).

The same analysis applies to Associate Superintendent Lambert. There is no evidence that Lambert had anything to do with the placement and retention of plaintiff in segregation. He was not involved in the events surrounding the disclosure of the confidential information. The record indicates that plaintiff addressed correspondence to Lambert complaining about Kelsey (dated April 16 and May 1, 1990). Lambert did not respond. His affidavit indicates that as he was not in charge of Special Housing Units, he would have forwarded the correspondence to the appropriate staff person. From the May 1, 1990 letter, it appears Lambert informed plaintiff that the matter had been forwarded to Mr. Van Boening for a response. Eventually, Captain Morgan responded by letter dated May 11, 1990. Plaintiff disputed Morgan's response and asked for an opportunity to present additional information (letter dated May 14), however, the next day plaintiff was placed in segregation. Lambert's alleged omission is simply not of constitutional magnitude. He was under no compulsion to respond personally to plaintiff's correspondence and there is no evidence that he attempted to cover-up alleged misconduct by Kelsey. Furthermore, as Blodgett points out, plaintiff could have used the formal grievance procedure to air his complaints about Kelsey.

---

**15.** The record does not indicate that Hults, Morgan, Lambert or Blodgett discussed the grievance or any of plaintiff's complaints with Kelsey either verbally or in writing.

**16.** Plaintiff says Kelsey constantly harassed him. He points out one specific episode where Kelsey allegedly rode on plaintiff's forklift in violation of regulations. Plaintiff states other inmates and supervisors in the metal shop told him that Kelsey was "out to get him."

■ Vicki McDaneld was not involved in plaintiff's initial placement in segregation. Plaintiff has not connected her with Kelsey's alleged acts of retaliation. There is no evidence that she intentionally covered-up information concerning an alleged failure to provide witness statement forms to certain witnesses named by the plaintiff. Her involvement is limited to her recommendation, as counselor, that plaintiff be retained in segregation. In making her recommendation, she relied in part on the confidential information and apparently spoke with some correctional staff about the alleged incident. Because she was under no legal compulsion to independently verify the veracity of the information, her alleged actions and/or omissions are not of constitutional magnitude.

Defendants Blodgett, Lambert and McDaneld are subject to dismissal on a strictly jurisdictional basis.

## E. Procedural Claims

■ Plaintiff complains about several procedural violations regarding his placement and retention in segregation. Plaintiff contends that the individuals whom he requested to provide witness statements were not given enough information to respond adequately. He alleges that some of the witnesses never received statement forms. He suggests that the requested witnesses were not given enough time to respond by the date of the first segregation hearing and that it was error for defendant Frazier to conduct the hearing prior to receipt of all of the statements. Plaintiff suggests he was not given sufficient notice of the allegations against him and that this prevented him from being able to prepare an adequate defense at the segregation hearing. Plaintiff states that he was unjustly deprived of a staff advisor at his segregation hearing. He also apparently contends that his initial review segregation hearing was unjustifiably delayed more than two working days from the time he was initially placed in segregation. *See* WAC 137-32-010(2).

WAC 137-32-015(d) states that the inmate has the opportunity to provide the hearing officer with names of inmates or institution staff from whom witness statements should be obtained.[17] Only witness statements are considered at the first classification meeting unless the hearing officer requires oral testimony for clarification. WAC 137-32-015(e). Plaintiff requested statements from twenty-one witnesses. Those names were written on the "Notice of Meeting" form dated May 25, 1990 which was apparently received by plaintiff on the same date. A written notation on the form seems to indicate that the witness statements forms were not sent out until May 30, one day prior to the scheduled hearing. Plaintiff states that he requested a continuance of the first hearing because not all of the statements had been received. If some statements were not received prior to the first hearing, it is unfortunate but the court fails to see how the plaintiff was prejudiced. As defendant Frazier points out, witnesses are under no legal compulsion to respond. They are not under subpoena and this is consistent with the informal, non-adversarial nature of administrative segregation proceedings.[18]

In any event, most of the witnesses who responded stated that they simply did not have any information to offer. The witnesses were asked to respond to the following: "Confidential information was received that Farr was planning an assault on C/O's. He is presently at IMU. Please return to Major Hearings ASAP." (Exs. attached to Ct.Rec. 37). The court finds that this information was sufficient to give witnesses an opportunity to respond. Di-

---

17. *Hewitt* says nothing about witnesses or witness statements in the context of administrative segregation hearings.

18. It is not clear how many witness statements were available at the first classification hearing conducted on May 31, 1990. The exhibits submitted by plaintiff with his motion for summary judgment (Ct.Rec. 37) include completed witness statements from John Lambert, Jackson, Base, Blodgett, Snively, Mike Lambert, Spencer, McGranahan, Wright, Postlewait, Rhoads and Hill. The statements are dated either May 30 or May 31. If they were not available for the first classification hearing, they certainly would have been available for any subsequent hearings.

vulging any more details may very well have placed the informant at the risk of being identified.

■■■ When plaintiff was initially placed in segregation, he was told basically as much as the prospective witnesses were told. According to the segregation authorization form: "Information has been supplied from a confidential source that state (sic) that Inmate Farr is involved in a plot to assault a correctional officer." Although this statement lacks a lot of supporting detail, once again the court must conclude that supplying any more information may have placed the informant at risk of identification. *Dawson v. Smith*, 719 F.2d 896, 899 (7th Cir.1983); *McCollum*, 695 F.2d at 1048. Accordingly, the court finds that plaintiff received sufficient notice.

Plaintiff claims that one individual (Bennett) him that he did not receive a witness statement form. There is no evidence that this was deliberate. Plaintiff has not indicated how the testimony of this witness or any of the other witnesses who failed to respond might have been of benefit to him.

Plaintiff is not entitled to a staff advisor under *Hewitt* or on the basis of the WAC. Under the WAC, the superintendent may approve of a staff advisor if he believes the inmate is unable to present his own case. WAC 137–32–015(6)(g).

■■■ Defendant Frazier states she does not recall why there was a delay between the time of plaintiff's segregation placement and his initial review hearing. If there is indeed a failure to comply with the WAC in this regard, the court considers it *de minimis*. Plaintiff has not alleged any specific prejudice resulting from the delay.

There are no procedural violations of constitutional magnitude.

## CONCLUSION

The court does not take plaintiff's allegations lightly. It seems to this court that prison officials would want to take every conceivable precaution in determining the reliability of confidential information. In this case, the confidential information passes the test, but not necessarily by an overwhelming margin. There is a risk of error, but not a "significant" risk of error that the information is unreliable. *McCollum*, 695 F.2d at 1049. Prison officials should be especially careful not to be too conclusory in assessing the reliability of informants. Ideally, the confidential information file should contain as much documentation as possible (taking into account security considerations) about the informant and the manner in which he obtained the information.[19]

Plaintiff knows that although prisoners do not forfeit all constitutional rights, those rights must be balanced with security concerns of the correctional institution. Confidential information is a particularly sensitive issue since it involves potential matters of life and death within the institution. *Id.* at 1048. The confidential information used against plaintiff might not pass muster in a criminal proceeding or a conventional civil proceeding, but it is sufficient in the administrative segregation context.

There are no issues of material fact to preclude this court from ruling as a matter of law that plaintiff was not retaliated against because of his use of the grievance procedure, that he was not placed and retained in administrative segregation arbitrarily and capriciously[20], and that he was not placed and retained in administrative segregation without procedural due process of law.

IT IS HEREBY ORDERED:

1. Defendants' motion for summary judgment (Ct.Rec. 44) is GRANTED.

---

**19.** Plaintiff has included as an exhibit a copy of a division directive detailing how Washington's correctional institutions should handle confidential information (Ex. attached to Ct.Rec. 179). This policy did not become effective until January 15, 1991, well after the date on which plaintiff was segregated. This policy, if followed, should definitely ensure the reliability of confidential information.

**20.** Obviously, for that reason, plaintiff's Eighth Amendment claim must also fail.

2. Plaintiff's motion for summary judgment (Ct.Rec. 37) is DENIED.

3. Plaintiff's amended complaint and all of the defendants named therein (Ct.Rec. 82) are DISMISSED with prejudice.[21]

4. Plaintiff's motion for sanctions (Ct. Rec. 191) is DENIED.[22]

IT IS SO ORDERED.

---

21. To the extent plaintiff sues these defendants in their official capacities, they would be subject to dismissal in any event on the basis of *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

22. That motion was previously stayed by the court (Ct.Rec. 202). It appears that defendants complied with the court's directive.